# CHARLESTON.

BARBOUR, STEDMAN & CO. v. W. H. TOMPKINS *et al.*

Submitted October 2, 1917.     Decided October 16, 1917.

1. MINES AND MINERALS—*Oil and Gas Lease—Construction—"Paying Quantities."*

   Under an oil and gas lease for the term of five years and as long thereafter as either mineral is produced from the land in paying quantities, the production required to effectuate such extension, in the absence of equitable circumstances varying the rule, is that quantity which will bring a reasonable pecuniary return in excess of the cost of production, regardless of any particular amount of profit derivable from the operation of the well. (p. 121).

2. SAME—*Oil and Gas Lease—Termination—Evidence.*

   The lessor can not terminate the lease merely because he thinks the quantity of gas discovered within the five year period is not sufficient to constitute a paying well, where the operator, reasonably and in good faith, claims it is such a well and is willing to pay the rental stipulated therefor. His judgment, when *bona fide,* is entitled to great weight in determining whether the gas is in fact produced in paying quantities. (p. 121).

Appeal from Circuit Court, Kanawha County.

Suit by Barbour, Stedman & Co. against W. H. Tompkins, the Charleston-Dunbar Natural Gas Company, and the Vespertine Oil & Gas Company, and others, in which George E. Price, special commissioner to sell the land to satisfy liens, petitioned for an adjudication of the rights of the parties to the lease. Decree for Tompkins, and the Charleston-Dunbar Natural Gas Company and the Vespertine Oil & Gas Company appeal.          *Reversed, and petition dismissed.*

*Donald O. Blagg, H. D. Rummell* and *Davis, Davis & Hall,* for appellant Charleston-Dunbar Nat. Gas Co.

*Payne, Minor & Bouchelle,* for appellant Vespertine Oil and Gas Co.

*George E. Price,* for appellee.

LYNCH, PRESIDENT:

The decree of which complaint is made on this appeal terminates the right of the assignee of an oil and gas lease to

continue the further operation of the well drilled on the land and the utilization of. the gas discovered therein, on the theory that gas was not found on the leased premises within the term prescribed by the lease.   The lessors are W. H. Tompkins and wife, owners of the land demised, and George E. Price, special commissioner to sell the land to satisfy liens against it under an earlier decree in the cause but which remains unexecuted.   The lease bears date November 9, 1908, and provides that 'this lease shall remain in force for the term of five years from this date and as long thereafter as oil or gas is produced therefrom in paying quantities''.   This proceeding arose by way of a petition filed in the cause by such commissioner, praying an adjudication of the rights of the parties to the lease.

The argument in support of the decree complained of emphasizes the phrase ''in paying quantities'', and proceeds upon the assumption—an assumption which lies at the very foundation of the controversy—that, although the volume of gas finally discovered in the well was sufficient to satisfy the requirements of that phrase, the discovery was not made within the five year period.   The recitals of the decree itself are that neither oil nor gas was discovered or produced on the leased premises prior to November 9, 1913, within the meaning of the lease, wherefore the Hamilton Company, the lessee, and its assignees, the Charleston-Dunbar Natural Gas Company and the Vespertine Oil & Gas Company, lost title to said lease by its expiration and by their failure to produce oil or gas from the premises within five years from November 9, 1908; that the subsequent discovery and production of gas by the assignees in a lower sand did not have the effect to reinvest title to said lease; and that, as the lease definitely fixed the duration of its term, the assignees had not the right to continue drilling on said land thereunder after the end of the term, and no right or title to any gas thereafter produced or to·the proceeds derived therefrom.

While no doubt does or can arise as to whether the volume of gas found in the well drilled on the land under the authority of the lease within a few days after November 9, 1913, met clearly every requirement thereof as to quantity to authorize the continuance of explorations on the land

under the extension clause, there is a conflict, more apparent than real, as we shall see, in the voluminous testimony introduced to show whether gas was found in the well on or about November 5, 1913, in quantities sufficient to confer on the assignee the right of further exploration either by drilling the well to lower sands in order to increase production, or other wells, after that date, under the qualified extension clause. So that the controversy between the parties is limited to the question whether gas was found in paying quantities in the Big Injun sand within the five year period—a mixed question of law and fact. This it is conceded is the real issue, the proper adjudication of which will determine the rights of the parties to the controversy.

By no mechanical device was a test made to ascertain with any approximate accuracy the quantity or volume of the gas produced in the Big Injun, or the rock pressure imparting energy to the flow of the well. The only attempt to ascertain the quantity and volume was by testimony introduced by appellees, among the witnesses being Prince Tompkins, son of the lessors, and two other persons who accompanied him, who say that, while at the well on November 9, 1913, with the avowed intention of ascertaining on that day the result of the operations conducted to discover oil or gas before the lease expired, they saw no evidence that either product had theretofore been or then was found in the well; that the casual examination made by them did not reveal the presence of gas, and that if the well had emitted gas they would have observed it. But they admit their lack of skill and experience in the conduct of oil and gas operations, and their lack of capacity and judgment to say with any degree of assurance whether the well then was producing any gas or if any its approximate volume and quantity, and that the well might have produced gas without their observing it. This seems to us to be a reasonable interpretation of their testimony upon this subject. With the exception of Prince Tompkins, they admit lack of interest in the question of discovery, gave little heed to it, and may not have seen or observed evidence of gas, if any there was, in the well.

Other testimony, especially that of the four witnesses

named Atkins, is equally, perhaps more, inconclusive. Their cross-examination warrants the conclusion that they were not at the well at any time when it is claimed by any one that gas had been found on the leased premises. The date they fix for their visit at the well was about two weeks prior to November 9th, the date of expiration fixed by the lease contract.

Nor can much probative force or value be attributed to the declarations, proved in chief and not as the basis of an impeachment, that little or no gas had been discovered in the well as late as November 9th. These declarations were made by the employees engaged by the drilling contractor, J. W. Ramsey & Company. They were not the agents of the lessee or of its assignees; and no declaration of theirs, even if established by proof, would bind the operating assignee or prejudice any rights it might have. What may have been said by such employees may have been admissible, but not conclusive.

The important testimony on the question now under discussion, and of the correctness of which there is no material contradiction except in one particular hereafter referred to, is that of George E. Price, the commissioner who joined in the execution of the lease. It was to him that Fred Paul Grosscup, as president and active agent of the Charleston-Dunbar Natural Gas Company, on November 5, 1913, applied for an extension of the lease term until the first day of December, upon condition that the well then being drilled should be completed on or before that date. Between them there is no disagreement as to what was said in the colloquium regarding the quantity of gas being emitted from the well prior to that interview. They differ only as to the sand through or into which the drill had penetrated; that is, whether the sand was the Big Lime or the Big Injun, from each of which gas is found in that locality. It was of the former Grosscup claims he spoke when applying for the extension, while Price claims Grosscup spoke only of failure to find gas in paying quantities in the Big Injun. This discrepancy or misapprehension may readily be accounted for in the partial similarity of the names and the admission of

Price that his "knowledge of the sands at that time was not very clear or definite", wherefore he adds, "I would not be absolutely positive what he said". When asked whether he might have mistaken Big Lime for Big Injun he replied, "There is a possibility of it".

Contrary to the usual expectations of operators in that territory, no gas was found in the Big Lime sand. That seems to be the one in which they hope to find oil or gas in paying quantities in that locality, although they .admit it does not possess the productive duration in flow, volume or rock pressure as do wells in other sands. But if it be admitted Grosscup did impart to Price the information contended for, nevertheless the proof tends to show that gas was discovered in the Big Injun on the night of the 5th or morning of the 6th, at least before the 9th, of November, a fact of which Grosscup had no knowledge when he applied for the extension.

Opposed to this testimony, considered in its entirety, as to the sufficiency of the gas discovered before November 9th in the Big Injun to satisfy the provisions of the lease, is that of appellants to the effect that the production so obtained, as variously estimated by witnesses, was from 100,000 to 500,-000 cubic feet daily, and that either quantity was sufficient to justify its profitable utilization in the local gas markets. Uncontradicted testimony adduced in their behalf clearly authorizes the finding that gas from wells producing less than either amount is marketed in that community in conjunction with other wells of the same character, and the returns from which yield a profit above the cost and expenses of delivery to the consumer.

While it is true estimates made by witnesses at the request of counsel representing the appellees indicate as meager profits from the production of such a well apart from other like wells in that region, the calculations based thereon nevertheless do show what may be deemed returns in excess of the actual cost of production even from one such well. If any such excess there be, must not the well be deemed one producing gas in paying quantities. within the meaning of the contract? To us it seems clear that there is no escape

from the conclusion that the well must be so considered and treated. The question is not how much may be derived from a sale of the gas, but rather whether it may be sold in the market for consumption as fuel with reasonable expectation of profitable returns in excess of costs and expenses. Whether there is a reasonable basis for the expectation of profitable returns from the well is the test. If the quantity be sufficient to warrant the use of the gas in the market, and the income therefrom is in excess of the actual marketing cost, the production satisfies the term "in paying quantities". The mere statement of Prince Tompkins and his companions that they saw no gas escaping from the well when they visited it does not by any means foreclose the question of its existence. Nor does his statement that gas was then being used in the jet and forge within the derrick at that time, contrary to the usual custom in such cases—a custom appellants deny except when the volume of gas produced exceeds the quantity claimed by them as found in the particular well in the Big Injun sand—warrant the withholding of faith and credit in testimony to the contrary not otherwise contradicted and which has the appearance of truthfulness, and justifies the conclusion that the gas discovered prior to November 9th was in paying quantities within the intention of the contracting parties.

This summary, though brief, we think fully and not unfairly discloses its purport and effect. To enlarge upon it by quotations or citations would extend the discussion beyond appropriate limits, and serve no useful purpose. If, therefore, the evidence shows the facts to be as stated, there does not exist a substantial foundation for the conclusion expressed in the decree that the assignees have lost right to the protection and benefit of the lease and the production of gas thereunder. Besides, as held in *Urpman* v. *Lowther Oil Co.*, 53 W. Va. 501, the phrase "in paying quantities", found in contracts of this kind, is to be construed with reference to the judgment of the operator, when exercised in good faith. The grantor of a right to explore his land for oil and gas can not forfeit the lease merely because he thinks the quantity of gas discovered therein was not sufficient to

constitute a paying well, where the lessee claims it is such a well and is willing to pay the rent stipulated therefor. It is for him to say, when acting in good faith, whether the gas is produced in paying quantities. *McGraw Oil Co.* v. *Kennedy,* 65 W. Va. 595. As confirmatory of, if not actually supporting, the same principle are the cases of *Oil Co.* v. *Coulehan,* 65 W. Va. 531; *Jennings* v. *Carbon Co.,* 73 W. Va. 215; *South Penn Oil Co.* v. *Snodgrass,* 71 W. Va. 438; *Young* v. *Oil Co.,* 194 Pa. 243; and Bryan, Petr. & Gas 109. The Charleston-Dunbar Natural Gas Company, through its managing agents, has declared the gas discovered in the Big Injun is in marketable quantities and that the company can sell it at a profit. Due weight must therefore be conceded to the opinion, honestly expressed, by the interested operator, when confirmed by others skilled and experienced in the same business. If the quantity discovered and produced from the Big Injun sand was ample, if marketed, to insure a reasonable return above expenses, the well was a paying gas well, and warranted the drilling thereof to the Berea Grit, whereby that quantity was increased to such an extent as to make it a very valuable well, though in the meantime the five year period had expired.

The facts summarized do not, in our opinion, justify the decree complained of. The expenditure of a total of $7000, paid in annual rentals and cost of drilling, while not decisive, entitles the operator to just and equitable consideration. Of this sum Tompkins received a substantial part. It enured to his benefit. Price himself, though not advised fully, because Grosscup at that time did not have the necessary knowledge, as to the quantity of gas found in the Big Injun, was of the opinion to recommend and did recommend to Tompkins the extension applied for on November 5th. This grant, however, soon thereafter proved to be unnecessary, and the negotiations therefor were discontinued.

For the reasons assigned, our order will reverse the decree of October 23, 1916, and dismiss the petition of the appellees.

*Decree reversed, petition dismissed.*