**NYSTEL v. THOMAS.**

No. 7497.

Court of Civil Appeals of Texas. Austin.

July 22, 1931.

Woodruff & Holloway, of Brownwood, for appellant.

Wilkinson & Wilkinson, of Brownwood, for appellee.

McCLENDON, C. J.

Thomas (lessor) sued Nystel (lessee) to have declared terminated an oil and gas lease upon an 80-acre tract of land in Brown county, on account of failure of the lessee to begin drilling well No. 3 upon the premises within one year after abandonment of well No. 2 thereon, as required in the lease; and for an injunction to prevent lessee from "further trespassing or intruding" upon the leased premises. Temporary injunction was granted and Nystel filed a cross-action for damages for suing out the injunction writ. A trial to a jury upon special issues resulted in a judgment in favor of Thomas both upon his suit and upon Nystel's cross-action. From this judgment Nystel has appealed.

The lease was executed November 1, 1924. The grant was for the sole purpose of mining and operating for oil and gas, laying pipe lines, etc., and provided that it should "remain in force and effect. subject, however, to performance of the terms and conditions hereinafter mentioned, for a term of five years from this date, and as long thereafter as oil and gas, or either of them is produced from said land by lessees or his assigns, in commercial quantities."

With reference to gas the lease provided:

"Lessee is to pay lessors one hundred dollars ($100.00) per annum for each well drilled on said premises in which gas is found in commercial quantities, payment therefor to begin thirty (30) days after the completion of said well, and to be made quarterly thereafter in advance; and such payment is to continue as to each well as long as it produces gas in commercial quantities.

"Lessors are to have gas free of cost from any such well or wells for all stoves and all inside lights in the principal dwelling house and in one tenant house on said tract of land during the time of this lease by making their own connections with said well or wells at their own risk and expense."

With reference to drilling it provided that actual drilling of a well should begin on the west half of the premises before February 1, 1925, unless on or before that date the lessee paid or tendered to the lessor $100, which payment or tender should operate as rental and cover the privilege of deferring the beginning of such well for three months from said date. If such well proved to be without oil or gas in commercial quantities, actual drilling of a second well should begin before November 1, 1925, unless like payment or tender should be made on or before that date, which would in like manner defer the beginning of such well for three months. The following is the clause involved in this litigation: "If both the first and second wells drilled on said 80 acre tract of land prove to be wells without either oil or gas in commercial quantities, then lessee shall within one year from the time of the completion of said second well begin the actual drilling of a third well on said land; and in the event he does not begin the drilling of said third well within said time, this lease shall thereupon terminate as to both parties hereto and shall cease to be of any further force and effect as to the whole of said 80 acre tract."

The $100 was paid so as to extend the time for drilling well No. 1, which well was begun during the extension period and was brought in in June or July, 1925, with a very strong gas pressure, so great in fact that all efforts to control it proved unavailing, and the railroad commission required that the well be filled up so as to prevent the further escape of gas. This was done by filling the well with a mud-laden fluid some time in July, 1925, and some thirty days after gas was discovered; and the well was thereupon abandoned. There was no payment or tender of rental on the theory that well No. 1 was a producer in commercial quantities until aft-

er this suit was filed. Well No. 2 was begun shortly thereafter and was completed or abandoned about December 1, 1925, as a dry hole. Nothing further was done on the leased premises until November, 1926, when Nystel erected his drilling rig over well No. 1 and proceeded to recondition it so as to produce gas as fuel for operating his machinery in drilling well No. 3 which he commenced about February 1, 1927, more than twelve months after abandonment of well No. 2.

Nystel's defense is based (1) upon compliance with the terms of the lease, and (2) upon waiver or estoppel as regards failure to begin drilling well No. 3 within twelve months after abandonment of well No. 2. His pleading in this regard is important, and we quote it in full:

"For further answer herein, defendant says that this defendant, in compliance with the terms, covenants and conditions in oil and gas lease mentioned in plaintiff's petition, commenced the drilling of the first well, as provided in said lease, within the time and in the manner therein provided; that said well not only produced gas in commercial and paying quantities, but gas produced therefrom was of such volume and pressure that the pipe with which said well was cased did not withstand the gas pressure, causing water to break in, as a result of which defendant shaled up the hole so as to preserve said well so that the same could be properly cased.

"That thereafter, defendant drilled the second well within the time and in the manner provided for in said lease, said second well being a dry hole.

"That defendant thereafter began the drilling of a third well on said land within the time and in the manner provided for in said lease, but before so doing, and by and with the consent and approval of plaintiff, defendant went back to his No. One Well, cleaned out and re-cased the same, so that he might have gas to use in drilling said third well; that upon so cleaning out and re-conditioning said No. One well, the same produced gas in paying quantities; that upon re-conditioning said well, defendant moved to the location of his third well, and was drilling the same when he was served with copy of writ of injunction in this cause, necessitating the suspension of further operations on said lease.

"That defendant drilled a well on said land producing gas in paying quantities, and tendered to plaintiff the rental on said well, as provided for in said lease, and in all things complied with the terms of said instrument so as to make the same a valid and subsisting oil and gas lease by reason of said facts.

"That not only was said lease a valid and subsisting oil and gas lease by reason of said matters, as above stated, but by reason of

plaintiff's acquiescence and agreement allowing defendant to clean out and recondition well No. One before beginning well No. 3 on said lease, plaintiff should be, and is now estopped to claim that said third well was not commenced or drilled so as to cause a forfeiture of said lease had the same not been commenced within the time provided in said lease, and further conditioned that the first two wells drilled thereon should not have resulted in the production of oil and gas in paying quantities."

In so far as this pleading may be construed as alleging that well No. 1 was originally brought in as a producer, it is wholly without support in the evidence, which conclusively establishes the abandonment of the well in July, 1925. No claim was then made by Nystel that it was a producer in commercial quantities in accordance with the lease; and there was no payment or tender of rentals, which would have accrued, if the well were such producer.

The alllegation that well No. 3 was begun within twelve months of abandonment of well No. 2 is also without support in the evidence.

■ Two theories of alleged defense remain: (1) Waiver or estoppel as regards time for commencing well No. 3; and (2) that well No. 1 as reconditioned was a producer in commercial quantities.

The issue of waiver or estoppel arises upon the exclusion of testimony. Upon this issue Nystel testified: "I had a conversation with Mr. Thomas about when I came back on the lease to this No. 1 well (within a year from completion of second well). He came and asked me what I was doing and I said I would try to clean out that well and use it as a gas well for further operation and drilling on the lease. He said he hoped I could do it. He did not make any objection to my reconditioning and going into No. 1 well. He did not. That seemed to be all right with him; it was so far as I know. I never heard of any objection."

The excluded testimony, as shown by the bill of exceptions was: "That if plaintiff, Grant Thomas, had not stated that it was agreeable with him (the plaintiff) for defendant to clean out No. 1 well so that the gas developed therefrom might be used in the drilling of No. 3 well, said defendant would have moved to No. 3 location and would have begun the actual drilling of said well within one year from the date of completion of No. 2 well."

The evidence, we think, was properly excluded, since no issue of waiver or estoppel was presented. The most that can be said of it is that it gave permission, if permission were necessary, to recondition well No. 1 for the purpose of obtaining fuel for the drilling of well No. 3. There is no suggestion or in-

timation that any term of the lease would be waived, or that there would be any extension of time in regard to beginning drilling of well No. 3, and the evidence, if admitted, would have presented no issue in that regard to be submitted to the jury. This testimony also negatives the idea that well No. 1 was to be reconditioned as a producer under the lease, the only purpose being as stated to provide fuel for the drilling of well No. 3.

The jury found in answer to special issue No. 1 that well No. 1 "did not prove to be a well with oil and gas in commercial quantities." In connection with this issue the court charged: "In answering this question you are instructed that 'proved' as here used means to ascertain or determine by observation, experiment or test. You are instructed that 'commercial quantities' as herein used means such quantities as would make it profitable to operate the well and produce oil or gas after paying all operating expenses."

No objection was made to the charge, but Nystel requested the following special charge, which the court gave: "In connection with Special Issue No. 1 you are instructed that if a well produces gas in sufficient quantities to pay a profit over the expense of operating the well, then it is producing in commercial quantities, although it may not repay the cost of drilling the well."

Nystel contends that the well was a producer in commercial quantities as a matter of law, and that there was no evidence to support the jury finding to the contrary.

The evidence was conclusive: That when the well was first brought in in 1925, it had a very strong gas pressure; that very shortly water got into it, either from bursting of the casing (Nystel's testimony), or from being drilled too deep (Thomas's testimony); that Nystel was unable to control it, and it was finally (July, 1925) stopped up with a mud-laden fluid, upon order of the railroad commission, to prevent escape of the gas and water percolation into other parts of the field; that it was definitely abandoned, and nothing further done with it for nearly a year and a half; that Nystel began to recondition it about November 15, 1926, for the purpose of obtaining fuel for drilling well No. 3; that it did produce some gas upon being reconditioned.

Upon the amount of gas produced the testimony is conflicting.

Nystel testified: "As soon as I baled this well down on this occasion it began to show gas. But I knew that I would have to pump it for awhile. I put a little engine and house there and pumped it day and night. As to whether I was able to recondition the well so as to make it produce gas: It made enough to run the pump engine and tractor and save me five dollars a tower on drilling. The gas I produced from that well was making me a

profit above the cost of operation of that well. * * * I finished my No. 1 well on the 17th day of January, 1927."

Thomas had notified Nystel on January 3, 1927, that the lease was forfeited and forbade him to further operate thereunder. Well No. 3 was begun February 1, 1927; this suit was filed February 8, 1927; the rent money was tendered February 9, 1927; and the injunction writ served February 11, 1927.

Thomas testified: "Before he had done that (started well No. 3) he had done some work on the first well; he had opened that up. * * * He put the drill over the first well and drilled out the mud and he put a little gasoline engine over it to pump the water. I do not know what all he did not do. Finally he got a little gas—a little gas came back. Maybe enough for house use out of the first well. It did not produce as much as it did at first. It might have produced enough for house use. He was pumping it every day. As to what he started to do with that gas: The Lord knows, I don't. * * * He did get some gas. He was using that gas in his operations when I stopped him."

Bruce, a witness for plaintiff, testified:

"After it had been plugged and then reopened, I saw that well * * * I observed the quantity of gas at that time. * * * About the last time I was over there Mr. Nystel had the stove in his camp house and he had the gas burning in this stove, and I was curious to see how much gas the well was making and I looked into the stove and he had some wood that he was burning in it. There was probably enough gas coming out of that pipe to run an ordinary gas stove. * * * He was not drilling at that time. * * * I saw that well after it had been finally reconditioned by Mr. Nystel. I saw it after he started to pump it with his little pump but I did not see it after he had laid the line over there. * * * He was still pumping the water off when I saw it. I do not know what it made after he finally got it in shape."

Rogers, a witness for plaintiff, testified: "After this well was reopened by Mr. Nystel and a pump put in it, I know what purpose the gas in it was used for. * * * He used it first in his shack and then when he started his third well he began to use it in that. I do not know of any other use he made of it. * * * I was there every day. * * * I do not know how much if any water it was making after it was reconditioned. He had it under the pump all the time; he had to pump it all the time. I do not know how much more gas was available for use at that time than he was using. * * * As to what volume of water was coming out of it: All that his engine would take care of. I could not say how long that engine had been running. As to whether it was running con-

stantly: If the engine stopped for thirty minutes * * * he had not any gas for his engine or his stove. The water would smother the gas out if he did not keep the engine going all the time. I could not say how long that was true, but all the time that he was running his No. 3 well. I know that he had to continue pumping all that time."

■ The test for determining "commercial quantity" in reference to discovery of gas laid down in Hanks v. Magnolia Petroleum Co. (Tex. Com. App.) 24 S.W.(2d) 5, 6, is whether the "quantity be sufficient to warrant the use of the gas in the market, and the income therefrom is in excess of the actual marketing cost."

Applying this test, we think there can be no question but that at least a fact issue was presented.

■ Nystel invokes the rule, "that the question of what amounts to oil and gas in paying quantities is a matter to be determined exclusively by the lessee acting in good faith." See Aycock v. Paraffine Oil Co. (Tex. Civ. App.) 210 S. W. 851; Texas Pacific Coal & Oil Co. v. Bruce (Tex. Civ. App.) 233 S. W. 535; Masterson v. Amarillo Oil Co. (Tex. Civ. App.) 253 S. W. 908, 915; Summers on Oil and Gas, p. 320.

Even under this rule we do not think the lessee could arbitrarily extend the lease by paying the rentals. Good faith would require that there be some basis of substance for a conclusion that the supply was sufficient to market at a profit. The evidence, we think, fairly raises this issue of good faith, and since appellant did not request an issue upon that subject, but submitted a definition in line with the rule in the Hanks Case,.above, which the court gave, we do not think he is in position to complain of the verdict.

But aside from this, we do not think appellant is in position to invoke this rule. In the absence of waiver or estoppel, the lease expired by its terms on December 1, 1926, unless kept alive by some express provision. The only express provisions which could extend it were: (1) "the actual drilling of.a third well," or (2) production in commercial quantities. Well No. 3 was not begun until February 1, 1927. It was not contended, either. in the pleading or in the evidence, that the reconditioning of well No. 1 constituted "the drilling of a third well," within the terms of the lease. The sole purpose of such reconditioning, as pleaded and proved, was to get fuel with which to drill well No. 3. All the evidence with reference to the production of well No. 1 after abandonment relates to the date of completing its reconditioning, which Nystel gives as January 17, 1927. The tender of the rentals was not until February 9, 1927, which, to comply with the lease, must have been within 30 days after production. The evidence negatives any production on December

ber 1, 1927, without which, in the absence of drilling No. 3 well, the lease expired by its express terms.

■■ The only remaining question is whether Nystel was entitled to the rental value (from $25 to $35 per day according to testimony) of his drilling machinery from February 11, 1927, the date the injunction writ was served, to March 24, 1927, the date of its modification.

The suit was to declare the lease forfeited for failure to begin drilling well No. 3 within a year after abandoning well No. 2. The allegation upon which the injunction was predicated was that Nystel "is now intruding and trespassing on said land, and claiming the right further to operate thereon under said lease; and has in fact within the last few days, begun the drilling of another well thereon, though warned, and forbidden by this plaintiff to do so." The prayer was that Nystel and his agents and employees be enjoined and restrained from "further trespassing and intruding upon said land, and from further operating, and attempting to operate, under said lease." The injunction followed the language of this prayer.

The lease contained this clause: "Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing."

Appellant contends that the language of the writ was broad enough to inhibit his going upon the premises to remove his machinery, and it was not incumbent upon him to seek its modification.

The writ should be construed in the light of the allegations of the petition, the subject-matter of the suit, and the object therein sought. When so construed we do not think it is reasonably susceptible of the construction that it inhibited the removal of appellant's machinery from the premises. The case of Hermann v. Allen, 103 Tex. 382, 128 S. W. 115, 117, is directly in point. We quote from the opinion by Mr. Justice Williams: "The charge of the trial court allowed the recovery of the value of the use of certain tools or apparatus for moving houses which plaintiff had put under the building in moving it before the injunction was issued. The writ restrained the parties from removing or in any way interfering with the building. We think that no reasonable construction of it required the plaintiff to leave his tools under the building. The removal of them when the building may have been supported by them would have been interfering with it in a sense, but plainly not in the sense of the writ, the manifest purpose of which was to stay the efforts to remove. It may be true, also, that the taking away of the tools or apparatus supporting the building might have necessitated the substitution of something

else in their stead, but this ought not to entitle the plaintiff as a measure of his damage to recover the value of the proper use of such appliances, alleged to be so costly, when applied to the use for which they are designed, when the use he chose to make of them was only as a support for the house. That attributes to the injunction a consequence which did not legally or reasonably flow from it."

The trial court's judgment is affirmed. Affirmed.