## PERSKY v. FIRST STATE BANK OF VERNON.

### No. 4911.

Court of Civil Appeals of Texas. Amarillo.

May 30, 1938.

Harris & Martin, of Wichita Falls, for appellant.

Berry, Warlick & Bunnenberg, of Vernon, for appellee.

FOLLEY, Justice.

This was a suit in trespass to try title filed by the appellee, First State Bank of Vernon, Texas, against the Texas State Oil Company, Sayre Oil Company, Texas United Corporation, and A. C. Wimmer, Trustee, in which suit the appellant, I. B. Persky, intervened, and wherein the appellee sought the cancellation of a certain gas and oil lease. The Sayre Oil Company was dismissed from the suit and the other named defendants in the trial court filed disclaimers, which left the controversy in the trial court and in this court between the First State Bank of Vernon and I. B. Persky.

On May 4, 1932, the appellee, being the owner of the land herein involved, leased to the Texas State Oil Company for oil and gas purposes, in consideration of the

covenants and agreements contained in the oil and gas lease, three hundred and fifty acres of land, out of H. & T. C. Ry. Co. Survey No. 108, Block 14; Survey No. 1 in Block No. 18 of the H. & T. C. Ry. Co. Surveys; Survey No. 3, W. A. McKinney Survey; and Survey No. 2, J. Day Land & Cattle Company. This lease contract was duly transferred to the appellant, I. B. Persky. The following provision from such oil and gas lease forms the basis for the controversy herein: "The delivery of this lease being contingent upon the discovery of oil and/or gas in paying quantities on said land, the same shall remain in full force and effect as long as such oil and/or gas is produced in paying quantities, * * *."

The appellee alleged that the Texas State Oil Company drilled on said land and discovered oil and gas in paying quantities. The appellee further alleged that on or about August 15, 1934, oil and gas ceased to be produced in paying quantities from the land and sought cancellation of the lease under the terms above quoted.

The appellant answered, among other things, that oil was being produced in paying quantities, and had been so produced continuously since oil and gas were first discovered. The case was tried before the court without a jury. The court found as a matter of fact that neither oil nor gas was being produced at time of trial (July, 1937) in paying quantities, and that by reason of that fact the title automatically reverted to the appellee. The court entered judgment for the appellee against the appellant and the disclaiming defendants for title and possession of the land, from which judgment the appellant Persky has appealed to this court.

The appellant attacks the sufficiency of the testimony to support the findings of the trial court that oil was not being produced in paying quantities from the well on the lease, asserting that the testimony shows that the returns from the sale of the oil exceeds the cost of operation and for that reason the well was producing oil in paying quantities.

The testimony is undisputed that at the time of the trial the well was producing from two and one half to three barrels of oil per day. When the well was drilled in 1932 it produced about twenty-five barrels per day. The appellant acquired the lease in September, 1936 after the suit had been filed against the other defendants below. He obtained the lease by purchasing the power plant, storage tanks, and other incidental equipment upon the lease, for which he paid the sum of $2,500. The lease produced during the fifteen months immediately preceding the trial a total of 993.71 barrels of oil which sold for $880.08. From this amount, after deducting the one-eighth royalty to the land owner, the sum of $770.07 remained for the lessee, or an average of $51.34 gross revenue per month. The appellant Persky owned the Flaniken lease adjoining the one in question, upon which there was another well operated with the same power and equipment, requiring the services of only one pumper for both wells. The testimony shows that appellant was paying such pumper $50.00 per month to operate both wells.

The appellee relies chiefly upon the testimony of Luther Webb in support of the court's finding. His testimony was largely opinion testimony based upon the agreed figures of the oil runs of the well in question. His opinion was to the effect that there was always some incidental expense connected with the lease and that he did not believe a well of that kind could be operated for less than $125 to $150 per month. He did not think there would be enough revenue from the well in question to pay the expenses of operation. On cross examination he qualified this testimony as follows:

"I notice that the production from this well was making two and a half or three barrels a day. The power plant that is used for the pumping of this well, is also used for pumping the well on the Flaniken lease. My statement a while ago was based upon a proposition that you would have to pay a pumper, a full time pumper, the usual and customary price paid in the field, from $100.00 to $135.00 per month. It was based upon the production of that well alone. If you had a condition out there whereby you would pump another well that made practically the same amount per day and you were able to pump those wells with a part time pumper at a salary of $50.00 per month, it would be just a matter of addition as to whether the well could be operated at a profit; if the revenue would be more than the expense, there would be a profit."

In addition to this testimony Webb testified that an operator as a rule takes into consideration all of his expenses, the depreciation on his physical properties, and the cost of drilling the well, which would not be charged up at any one time but extended over the whole production period.

To offset the above testimony, the appellant testified that he purchased the lease in question in September, 1936; that the well on the lease was about 1,400 feet deep; that after he bought it, he pulled the rods and put new cups on to try to increase the production; that the well was producing when he bought the lease; that it had been producing continuously since that time; that the well was making from two and one-half to three barrels per day; that he owned the power plant; that he had another well on the Flaniken lease and that the power plant was pulling both wells; that he hired a pumper at $40 per month and raised his wages to $50 per month; that it did not take all of the pumper's time to operate the lease; that the $50 per month pays the pumper to operate both leases; that the only expense he had besides the $50 per month to the pumper was occasionally a couple of cups, and, if he had pulled the rods, a little grease; that he obtained gas from the leases for running the power and the wells made more than enough gas to pump the two wells; that it cost him no more than $25 to $30 apiece to operate each well each month; that he was making about $100 per month out of both of the wells; and that taking into consideration all of his expenses in pumping the well in question, he was making a profit on it.

In defining the term "in paying quantities" as applied to a gas lease, the Commission of Appeals in the case of Hanks v. Magnolia Petroleum Co., 24 S.W.2d 5, said: "The words 'paying quantities' as applied to a gas lease mean that the gas discovered must be sufficient to pay the lessee a profit, though small, over operating and marketing expenses, although it may never repay the cost of drilling the well. Aycock v. Paraffine Oil Co. (Tex.Civ.App.) 210 S.W. 851; Masterson v. Amarillo Oil Co. (Tex.Civ.App.) 253 S.W. 908; Summers Oil & Gas, p. 318."

This rule applies not only to gas leases but to oil leases. There seems to be no controversy between the parties herein as to the law of this case. Both agree that if the well is being operated at a profit the lease should not be cancelled. The only controversy is the application of the above rule to the facts in this case. The appellee asserts that, after deducting the necessary expenses in operating the lease, there is no profit left. The appellant contends the contrary is true. From the above definition of "paying quantities" it is apparent that the witness Webb could not include the cost of drilling the well in the instant case in determining whether or not oil was being produced in paying quantities.

The judgment of the trial court was based solely upon the theory that the lease had ceased to produce oil or gas in paying quantities. The testimony of Webb is the only evidence in the record of any probative force upon which the court could have reasonably based his finding in this respect. That such testimony is merely opinion testimony based upon a hypothesis that did not exist in this case is apparent from the portion quoted above. The appellant in this case was evidently able to make a better trade with a pumper than is the usual and customary arrangement known to Mr. Webb and the oil industry. Not by opinion testimony but by direct, positive and corroborated testimony, the appellant established the fact that he was making a profit from his well on the lease in question. The records from the sale of oil to the pipe line companies show the gross income from the well was more than $50 per month. The appellant says that his total expense involved in making that revenue has not been more than $30 any month since he purchased the lease. The appellee does not show any other expenses incurred by the appellant, and the burden in this respect is upon the appellee.

In this connection the appellee contends that a certain amount should be deducted from the gross monthly receipts for the depreciation in the pumping machinery and for state, county and school taxes upon the property, and, although there was no evidence introduced to indicate such amounts, that this court should take judicial knowledge of the amount of depreciation in the property and the amount of the taxes. We might take judicial knowledge that all property of this kind has some depreciation from year to year, but we could not, in the absence of testimony to support it, take judicial knowledge of the percentage or amount of such depreciation. As far as the taxes on the property are concerned we would have no accurate method of ascertaining the amounts that might be due the respective political bodies. As most of our taxes are local, and all property is locally assessed and valued, we could not arrive at any correct amount to be deducted from the gross monthly receipts from the well. All such matters were available to the appellee in the trial of the case and we cannot supply

such necessary items of proof omitted by it in the trial court.

It is our opinion that the overwhelming weight of the testimony in this case shows that the appellant was making a profit from his oil well and there is insufficient evidence in the record to show otherwise. We therefore think the court erred in rendering judgment for the appellee based upon the proposition that the oil was not being produced in paying quantities, and such being our opinion, we sustain this assignment.

We have considered the other assignments of the appellant and we are of the opinion they are without merit.

The judgment is reversed and the cause remanded.