COWDEN et al. v. GENERAL CRUDE
OIL CO.

No. 4554.

Court of Civil Appeals of Texas.
Eighth District.

May 12, 1948.

Rehearing Denied June 16, 1948.

110

W. C. Franklin, of Tulsa, Okl., for Limpia Royalties.

Klapproth & Hamilton, of Midland, for Cowden.

Andrews, Kurth, Campbell & Bradley and W. M. Streetman, all of Houston, and Whitaker, Turpin, Kerr, Smith & Brooks, of Midland, for appellee.

PRICE, Chief Justice.

This is an appeal from a judgment of the District Court of Ector County, 70th Judicial District. R. B. Cowden, appellant, sued General Crude Oil Company to recover title to and possession of $^{15}/_{16}$ of the oil and gas leasehold estate in the North one-half ($\frac{1}{2}$) of the Southwest one-fourth ($\frac{1}{4}$) of Section 2, Block 45, Township 1-0, Cert. 4407, T&P Co. Survey, Ector County. Cowden also impleaded Limpia Royalties, a trust estate, as claimant of the other $^{1}/_{16}$ royalty estate. Thereafter Limpia Royalties for all practical purposes became a party plaintiff. Appellant Cowden also

claimed damages in the sum of $40,000.00 against appellee for its failure on demand to release the land in question from a purported oil, gas and mineral lease alleged to be held by it. Appellee pleaded not guilty and a general denial.

The trial was before the court without a jury, the judgment that appellants take nothing. From this judgment appellants Cowden and Limpia Royalties have perfected this appeal. Upon the motion of appellants the court made up and filed findings of fact and conclusions of law, and thereafter refused the motion of appellants for additional findings. A brief statement of the claim of title to the respective parties will aid in a consideration of the case. On July 31, 1925, H. E. Cummins and wife were the owners of 9534 acres of land, including the herein involved area. On that date Cummins and wife executed and delivered to J. W. Grant an oil, gas and mineral lease covering said 9534 acres of land which included the land here involved. On March 25, 1929, Cummins and wife conveyed to appellants all of Section 2, Block 45, which included the land in controversy here. Appellant Cowden joined by his wife conveyed to appellant Limpia Royalties an undivided $^{1}/_{16}$ mineral interest in and to the gas and minerals in and to a number of sections of land in Ector County. Included in this conveyance was the land in controversy. By regular mesne assignment from J. W. Grant appellee acquired title to $^{7}/_{8}$ oil, gas and mineral leasehold estate created by the said lease by said Cummins and wife to J. W. Grant, insofar as said oil, gas and mineral leasehold covered the south $\frac{1}{2}$ of the northwest $\frac{1}{4}$ of Section 24; the south $\frac{1}{2}$ of the southeast $\frac{1}{4}$ of Section 26; the south $\frac{1}{2}$ of the northeast $\frac{1}{4}$ of Section 32; and the north $\frac{1}{2}$ of the southwest $\frac{1}{4}$ of Section 2, among other lands.

The primary term of the basic lease dated July 31, 1925 was for ten years and as long thereafter as mineral sales, substances and liquids or any of them were produced from said land by lessee in paying quantities. It provided if no well be commenced before the expiration of the first year the lease should terminate unless delay rentals were paid and these should keep the lease in effect for one year, and so on for each suc-

cessive year of the primary term. There is no question but that lessee kept the lease in force for the ten years of the primary term. Under the testimony a well was drilled on the northwest ¼ of Section 10, Block 45, included in the boundaries of the basic lease before the expiration of the primary term. The question litigated was whether this well produced oil or gas or oil and gas in paying quantities. If it did, it was sufficient to continue the basic lease in force after expiration of the ten years constituting the primary term. Appellants, however, further contend that as to the area here involved appellee failed to use reasonable diligence in the development thereof. Beyond question if appellee failed to develop minerals in paying quantities on any part of the basic lease before the expiration of the primary term same expired on July 31, 1935.

Paragraphs IX, X, XI and XII of the court's findings of fact were as follows:

"IX. Gas and/or oil was discovered on and produced from some part of the land covered by the original lease in paying quantities prior to July 31, 1935 (the end of the primary term of said lease), and gas and/or oil was thereafter produced from some part of the land covered by the original lease in paying quantities from July 31, 1935 to the time of trial.

"X. The oil and gas lease mentioned in Paragraph II above contains the following two provisions:

" '8th. Lessee shall pay Lessor One Hundred Dollars each year in advance for gas from each well where gas only is found while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the time by making his own connection with the well at his own risk and expense.

" '9th. Lessee agrees to pay lessor for gas produced on any oil well and used off the premises at the rate of twenty-five ($25.00) Dollars per year, for the time during which such gas shall be used, said payments to be made each three months in advance.'

"XI. It was stipulated by and between Plaintiff, R. B. Cowden, and Intervenor, Limpia Royalties, a Trust Estate, and Defendant, General Crude Oil Company, that oil and gas was discovered and produced in paying quantities prior to January 1, 1937, on some part of the original leased premises, and that oil and/or gas have been continuously produced from some part of the original leased premises in paying quantities continuously since January 1, 1937.

"XII. In June, 1935, One Hundred Dollars was paid to the royalty owners in proportion to their respective interests under the tract on which production had then been obtained, and like payments were made in June of 1936 and 1937."

Conclusions of law were as follows:

"I. The discovery of gas and/or oil and the production thereof from some part of the land covered by the original lease in paying quantities prior to July 31, 1935, and the production of gas and/or oil from July 31, 1935, to the date of the trial in paying quantities was sufficient to keep the lease in force under its habendum clause.

"II. The payment of One Hundred Dollars per year in 1935, 1936 and 1937 kept the lease in force at least up to January 1, 1937, under Paragraphs 8th and 9th of the lease, and said lease was kept in force as a matter of law subsequent to January 1, 1937, by the production of oil and/or gas in paying quantities.

"III. Since the lease is still in full force and effect, there cannot be any damages as a matter of law by reason of Defendant's, General Crude Oil Company, not having executed a release thereof. Further as a matter of law, the evidence was insufficient to raise an issue of damages." (p. 31–32, Transcript)

Appellants sought to have the court make additional findings which were in a large measure in conflict with the original findings. The court refused the request. The evidence amply sustains paragraph XI of the Court's findings of fact, so we are only concerned with the period elapsing between a few months prior to the expiration of the primary term and January 1, 1937. July 31, 1935 was the date of the expiration of the primary term, unless such term was

continued in force by production in paying quantities.

It is conceded by all parties hereto that prior to July 31, 1935, a well was drilled on a part of the basic lease but not on a part of the area here involved. This well was completed on July 4, 1934. Oil and gas were found in the well. No oil was sold from the well up to July 31, 1935. The oil produced from said well prior to July 31, 1935, was in the amount of 516 barrels and was placed in storage tanks and thereafter sold.

■ Before considering the sufficiency of the evidence to support finding No. 9 it may be helpful to consider what is meant by the term "in paying quantities" as applied to an oil and gas lease where the estate granted is limited to the period in which there is production to this extent. In the case of Hanks v. Magnolia Petroleum Co., Tex.Com.App., 24 S.W.2d 5, it is said:

"The words 'paying quantity' as applied to a gas lease mean that the gas discovered must be sufficient to pay the lessee a profit, though small, over operating and marketing expenses, although it may never repay the cost of drilling the well." Aycock v. Paraffine Oil Co., Tex.Civ.App., 210 S.W. 851; Masterson v. Amarillo Oil Co., Tex. Civ.App., 253 S.W. 908; Summers Oil & Gas, p. 318.

Authorities might be multiplied sustaining the above definition. Grubstake Investment Ass'n v. Worley, Tex.Civ.App., 116 S.W.2d 472; Persky v. First State Bank of Vernon, Tex.Civ.App., 117 S.W.2d 861; Garcia v. King, 139 Tex. 578, 164 S.W.2d 509; Cox et al. v. Miller, Tex.Civ.App., 184 S.W.2d 323 (Wr.Ref.); 2 Summers Oil & Gas, Perm.Ed., § 306.

As has been stated, the trial court found in substance that there was production in paying quantities prior to July 31, 1935, the date of the expiration of the ten year primary term, continuing to the date of the trial. It likewise appears that there was no question but there was production on some part of the basic lease from January 1st, 1937, to the present time.

■ Within the content of the term "produced in paying quantities" as used in the lease is not only the discovery of oil and gas with potential paying quantities but the lessee is further required to operate the well and market the product within a reasonable time. Hanks v. Magnolia Petroleum Co., supra; Smith v. Sun Oil Co., 172 La. 655, 135 So. 15; This case is cited with approval in Cox v. Miller, supra.

■ It is thought that it is elementary that where gas or oil is discovered within the primary term, lessee is entitled to a reasonable time within which to market same.

Here the well was completed July 1, 1934. The case of Hanks v. Magnolia Petroleum Co., supra, quotes with approval from the case of Barbour, Stedman & Co. v. Tompkins et al., 81 W.Va. 116, 93 S.E. 1038, 1040, L.R.A.1918B, 365:

"The question is not how much may be derived from a sale of the gas, but rather whether it may be sold in the market for consumption as fuel with reasonable expectation of profitable returns in excess of costs and expenses. Whether there is a reasonable basis for the expectation of profitable returns from the well is the test. If the quantity be sufficient to warrant the use of the gas in the market, and the income therefrom is in excess of the actual marketing costs, the production satisfies the term 'in paying quantities.' "

The holders of that portion of the lease on which was located the well completed as aforesaid on or about July 4, 1934, paid lessors or successors entitled the sum of $100.00 per annum as royalty on said well. These payments have been continued from prior to July 31, 1935, the date of the expiration of the basic lease to the present time. Gas produced by this well has been sold from time to time from July 4, 1935 to January 1st, 1937, in fact it has been sold from prior to July 1935 to the present time.

It is thought to be elementary that where oil or gas are discovered during the primary term that if it is in potential paying quantities a reasonable time must be allowed to realize therefrom.

■ Appellants purchased a portion of the area covered by the basic lease. The land so purchased was pro tanto subject to

the burdens of the lease and he succeeded pro tanto to the privileges accruing under the basic lease. It is thought that the payment of $100.00 per year as royalty on gas produced would not serve to keep the lease alive beyond the primary term unless such production netted an operating profit to lessee or its assignee. The case of Hanks v. Magnolia Petroleum Company, supra, is thought to set forth the correct rule as to elements to be taken into consideration in determining when a net profit is realized.

■ Under the terms of this lease lessee had the right to use free gas produced for development on any part of the 9534 acres included therein. An assignee of a portion of lessee's interest in a specific portion of the leased premises would have the right to use gas free on his premises. It is thought that he could not be required under the assignment to furnish free gas for the other portions of the area covered by the basic lease, in short, that gas sold by such assignee to the holders of rights in other portions of the premises may be considered on the issue as to whether there was production in paying quantities so as to continue the primary term of the basic lease.

■ The well relied upon by appellee to continue the basic lease in force from July 31, 1935 to January 1, 1937 was, as has been stated, completed about July 4, 1934, by an assignee of the lessee as to a portion of the area covered by the basic lease. There is evidence of gas sold from the well during the period in question—that is, from July 31, 1935 to Jan. 1, 1937; evidence that all during the period that as royalty the company paid to the parties entitled thereto the sum of $100.00 per annum. Appellants assert that there is evidence of some sales of gas from the well prior to July 31, 1935 and others subsequent, but there is no evidence as to cost of production and marketing. It is thought to be elementary that gas sold from the well after the assignments of other portions of the area covered by the basic lease is to be considered in determining whether there was production in paying quantities.

■ One fact stands out clear in the evidence—that the sublessee continued to produce and sell gas from this well prior to and after July 31, 1935, and has continued so to do down to the present time. This fact might warrant an inference that an operation profit was realized therefrom. If the lease had expired by its own limitations the operation after July 31, 1935 would have been a trespass. If a profit was not derived the continued operation would be futile, it would result in the loss of money to the operator and would not serve to continue the basic term in force. Why, prior to and subsequent to the expiration of the primary lease, pay to the owners of the royalty $100.00 per year? Unless there was production in paying quantities it would not serve to continue the term in force.

Joe R. Dunlap, one of the Accounting Supervisors of the Atlantic Refining Company, the owner and operator of the well in question, testified in substance as follows:

■ The records of said company show that for the year beginning August 1st, 1935 and ending July 31, 1936, a total gas revenue of $347.31 and operating cost of $57.57. This was an excess of $289.74 over expenditures; that for the year beginning August 1, 1936 and ending July 31, 1937, a gas revenue of $186.13 and oil revenue of $176.76, or a total revenue of $362.89; that operating costs for this period showed a sum of $224.37, an excess revenue over expense of $138.52.

It is thought that this testimony is sufficient to support the finding of the trial court—in substance that oil and gas were produced in paying quantities from prior to July 31, 1935 to January 1, 1937. This independent of the circumstances before narrated. In several precedents herein cited, as here, the operational profit was small. We agree with the conclusion of the trial court the lease as to the 80 acres has not expired by reason of the limitation "so long as production is in paying quantities."

■ Appellants contend that for failure to develop with reasonable diligence this lease has terminated as to the 80 acres here in controversy. In considering this question it is to be borne in mind that the basic lease covered some 9534 acres. Further, by assignment or sub-lease, title to the oil,

gas and other minerals under a portion of the area included in the basic lease much larger than the 80 acres here involved vested in the appellee. There was implied in the lease here a covenant, after there was production in paying quantities to develop the property with reasonable diligence. This covenant extended to the entire area covered by the basic lease, likewise it applied to each assignee or sub-lessee as to the area covered by his assignment. The obligation was to develop and operate the leased premises for the purpose of producing and marketing gas, oil or other minerals found in paying quantities thereon. W.T.Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27; Grubb v. McAfee, 109 Tex. 527, 212 S.W. 464; Knight v. Chicago Corporation, 144 Tex. 98, 188 S.W.2d 564.

There is no contention here that as to the said 80 acres involved there was a duty to drill offset wells.

The trial court made no express finding on the issue of a breach of implied covenant to reasonably develop the Cowden land for oil and gas, that is, the 80 acres, and request for finding that the appellee had breached such implied covenant was refused. It is thought that there was an implied finding by the trial court that there was no such breach of covenant to develop. There was development on the basic lease. This development indicated that there was oil and gas somewhere in the area covered by the basic lease. In what proximity to the 80 acres here involved does not appear.

This 80 acres was not segregated by appellee from the area as to which it succeeded to the rights and duties of the lessee. It was first segregated by the acts of the lessors on March 25, 1929, by virtue of the conveyance by H. E. Cummins to appellant. The effect of this conveyance was to invest appellant Cowden with such rights and interests as were held by the lessors. However, subsequently appellee was vested with the rights of lessee in and to an area which included the 80 acres in question.

The statements under the proposition point to no particular probabilities that drilling on this particular 80 acres would result in the development of oil or gas in paying quantities. There was evidence that at one time since appellant acquired this interest in the basic lease that his interest had a market value of $200.00 per acre; that its value was now only about $10.00 per acre. If any inference is to be drawn from this testimony it is that such decrease in market value is on account of the demonstrated probability that paying production could not be developed thereon. The burden was upon appellant to show a breach of the covenant to develop. We think a finding may be fairly attributed to the trial court that there was no breach of the covenant to develop. We see no evidence in the Statement of Facts indicating that oil or gas would have probably been developed on this 80 acres in paying quantities. It is thought under the implied covenant to reasonably develop the duty to drill on any particular portion of the leased area only arises when there is a reasonable prospect of developing paying production. Paying production in this sense is a production that would return a profit not only on the operation but a profit on the cost of drilling and the cost of the operation site.

The holding that there was no evidence of a breach of the implied covenant to develop renders it unnecessary to discuss the effect of a breach. The legal consequences of such a breach is authoritatively determined in the case of W. A. Waggoner Estate et al. v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27.

What has been said disposes of appellants' claim for damages. No reversible error appearing in the record, it is ordered that the judgment of the trial court be in all things affirmed.

On Motion for Rehearing.

McGILL, Justice (concurring).

In order that the lease be continued beyond the primary term of ten years under the clause fixing the primary term it was necessary that oil or gas should be being produced in paying quantities on July 31, 1935, the end of the primary term. Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339. It is clear from the Atlantic ledger sheets, Exhibit D–17 that oil was not being produced on that date in

paying quantities. The only production shown during the primary term is 511 barrels in September 1934, 5 barrels in April 1935 and 5 barrels in July 1935. In other words, from October to July inclusive, a period of ten months, only ten barrels was produced. Under no possible theory could this be said to constitute production in paying quantities during this ten month period or any part of it. That there may have been production in paying quantities in September 1934 is immaterial—the important time is the date of the termination of the primary term. Freeman v. Magnolia Petroleum Co. supra. The ledger sheets also show that there was no substantial production of oil after the primary term until March 1937; therefore, as far as oil is concerned, even though there had been production during the primary term and at its end, the lease automatically terminated after the primary term upon cessation of production. Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 137 A.L.R. 1032. That there may have been no market which would warrant profitable operation during this time is unimportant. Shell Oil Co. v. Goodroe, Tex.Civ.App., 197 S.W.2d 395.

The Atlantic ledger sheets Exhibit D–16 also show that the only gas produced and sold during the primary term was in March, April and May 1935. The revenues from these sales totalled $825.00. Dunlap's testimony shows that a profit was made from the gas sold from August 1, 1935 to July 31, 1936, of $289.74; also that there was gas revenue from August 1, 1936 to July 31, 1937 of $176.13. If it was incumbent upon Cowden to show what expenses were incurred against this revenue and the $825.00 revenue received from gas sold during the primary term as indicated in Persky v. First State Bank of Vernon, Tex.Civ.App., 117 S.W.2d 861, he did not do so. The question then is, was this showing sufficient to sustain the finding that gas was being produced in paying quantities either at the date the primary term ended or between that date and January 1, 1937 under the rule enunciated in Hanks v. Magnolia Petroleum Co., Tex.Com.App., 24 S.W.2d 5. In Texas this depends on the good faith of the lessee. Texas Pacific Coal & Oil Co. v. Bruce, Tex.Civ.App., 233 S.W. 535; Little v. Stephenson, Tex.Civ.App., 1 S.W.2d 353, affirmed Tex.Com.App., 12 S.W.2d 196; Nystel v. Thomas, Tex.Civ.App., 42 S.W. 2d 168; 2 Summers Oil & Gas, Perm.Ed., § 307.

Under the first clause of the lease lessee agreed to deliver to the lessors: "On all other minerals or substances produced (clearly including gas) an equal 1/8 part of that produced and saved from said leased premises to be delivered at the surface." Under the Hanks case this would require the lessee to install facilities to receive the gas at the surface and carry it to a market. Under the fourth clause of the lease the lessee was given the "right to use free of cost gas * * * produced on said land for its operations thereon"; that is, on the 9534 acres. Under the tenth clause either party is given the right to assign the lease in whole or in part. Such partial assignee undoubtedly had the right to use gas from any well brought in on the portion of land assigned to him for his operations on said land without cost under the fourth clause of the lease. He clearly was under no obligation to furnish gas free to another producer not operating on the portion of the lease assigned to him, but had the right to sell gas to such producers. There can be little doubt that lessors or their assigns were entitled to an equal 1/8 part of gas so sold under the first clause of the lease, as well as the annual payment specified in the 8th and 9th clauses. Undoubtedly the primary consideration moving to lessors for their agreement that the lease should remain in force after the expiration of the ten year primary term so long as gas (among other minerals or substances) should be produced on the leased lands in paying quantities, was the 1/8 part of such gas and not the payments stipulated in the 8th and 9th clauses in the lease; otherwise the lease could have been continued after the primary term at less cost to lessee than during the primary term, since during that term he was obligated to pay in addition to the $100.00 and $25.00 specified in the eighth and ninth clauses, annual rentals of $953.40 or 10¢ per acre. From the standpoint of the partial assignee—lessee (appellee) there is no question but that a small profit was shown on gas produced not only

during the primary term and at its termination, but "thereafter" until January 1, 1937. The serious question is whether sales to other producers on the premises show a market where the probable income would be in excess of marketing cost. The fact that such a market might and probably would be unstable because dependent on whether such producers brought in gas wells of their own is immaterial. The rule of the Hanks case is satisfied if it is shown that during the relevant times there was a market where a small profit was made or could have been made.

I conclude that while appellee did not make such showing as to oil, it did as to gas; that our original disposition is correct and the motion for rehearing should be overruled.