### STANOLIND OIL & GAS CO. et al. v. BARNHILL et al.

#### No. 4777.

Court of Civil Appeals of Texas. Amarillo.

June 21, 1937.

Rehearing Denied July 10, 1937.

Turner, Rogers & Winn, of Dallas (Clay Tallman and L. A. Thompson, both of Tulsa, Okl., of counsel), for appellants.

Small & Arney, of Amarillo, for appellees.

STOKES, Justice.

This appeal is from a judgment of the district court of Potter county in favor of the appellees, who were defendants in that court. The suit was filed by appellants, Stanolind Oil & Gas Company and J. A. Batson, each claiming to own a half interest in an oil and gas lease on 160 acres of land in Hutchinson county, the Stanolind Oil & Gas Company claiming to own the entire lease on the remaining portion of the tract involved of 960 acres. The petition was in the form of trespass to try title to the seven-eighths of the oil and gas conveyed by the lease, and setting up additional facts concerning operations, development, and production of gas in such manner and quantities as to comply with the terms of the lease and continue the same in force for an indefinite term under its production clause. There is no controversy over the pleadings.

The lease was executed by appellees, J. R. Barnhill and wife and O. B. Carver, to J. A. Batson, and the interest claimed by Stanolind Oil & Gas Company duly assigned to it by the latter. It was dated February 4, 1930, and, by its terms, was to continue for a term of five years and as much longer as oil or gas or either of them should be produced from the land by the lessee. The sum of $10,000 was paid as cash consideration for the lease; and it contained further provisions for the payment of rentals in the sum of $1 per acre if no well were commenced on the land before February 4, 1931, and like payments annually in the absence of drilling operations.

Appellants commenced the drilling of a well on the land December 23, 1930, discovered gas and completed the drilling March 31, 1931, at a depth of 3,370 feet after plugging back from the total depth drilled of 3,498 feet. Tests showed a potential production of more than 7,000,000 feet of sour gas per day, and a pressure of 410 pounds. The well was gauged at intervals of about a month continuously from the date it was completed up to December 5, 1935, when the last test was made and the supply and pressure continued equally as good or better, with a slight increase toward the last portion of the period. No delay rentals were paid, and on May 11, 1932, appellees executed and filed in the office of the county clerk of Hutchinson county an affidavit setting forth this fact, and on May 26, 1932, appellants caused to be filed in the same office an affidavit in substance that the lease was in good standing. Appellants expended about $25,000 in drilling the well, in addition to the $10,000 paid to appellees for the lease.

There was no demand for sour gas, and no market for it, especially from small, isolated wells, such as the one involved here, until late in the year 1935, when House Bill No. 266, enacted by the Forty-Fourth Legislature, became effective, prohibiting the use of sweet dry gas in the manufacture of carbon black, and, though appellants made every reasonable effort to market the product of the well, they were unable to do so until about October, 1935. On the 9th of that month, appellant Stanolind Oil & Gas Company made a contract with Phillips Petroleum Company to begin the delivery of gas from the well on December 31, 1935, but, before the latter date, appellees notified the Phillips Petroleum Company and appellants that the lease had terminated and the Phillips Petroleum Company then declined to take the product of the well until the status of the lease was definitely determined. It was to determine that issue that this suit was filed.

The case was tried by the court, without a jury, and the trial judge filed findings of fact substantially in accordance with the foregoing statement. His conclusion of law was, in substance, that, regardless of what may have been the rights of appellees prior to February 4, 1935, as to forfeiture, there being no production of either oil or gas in paying quantities, as provided by the lease, it expired on that date, which was five years after its date, and judgment was entered denying appellants any relief, canceling the oil and gas lease and removing the cloud cast upon appellees' title to the land and vesting the title in them.

Appellants present the case in this court upon four propositions, the pertinent questions raised in all of which we think may be reduced to the contention that, under the oil and gas lease, appellants hold a determinable fee in the oil and gas conveyed by the same, which is not terminated by failure to sell the product on account of a non existing market, there being no abandonment of the lease and, if the lessors have a remedy, it is one for damages and not for a cancellation of the lease.

■ It is not an open question in Texas as to the nature of the title or interest of the lessee in an oil and gas lease, such as the one involved here. It invests the lessee and his assigns with the title to oil and gas in place, which is a determinable fee and which is lost on cessation of the use of the land for the purposes of exploration, development, and production of the oil and gas that may be in the land. Where such a lease provides for royalties and fails to define the lessee's duty in respect to development after oil or gas in paying quantities has been discovered, the law implies the obligation of the lessee to continue the development and production of the product with reasonable diligence, and a breach of his duties in that respect will not authorize the forfeiture of the lease as would be the result of a breach of a condition subsequent, such obligation being a covenant. Grubb v. McAfee, 109 Tex. 527, 530, 212 S.W. 464; Texas Company v. Davis, 113 Tex. 321, 335, 254 S.W. 304, 255 S.W. 601; Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.(2d) 27; Mon-Tex Corporation v. Poteet, 118 Tex. 546, 19 S.W.(2d) 32. Such is the law in cases wherein there is no question as to the actual production of the product in paying quantities. When a well has been drilled upon the property and oil or gas in paying quantities once produced therefrom, the failure of the lessee further to develop the property is, under the holdings of the courts, a breach of an implied covenant, the usual remedy for which is an action for damages. It is only in extraordinary circumstances, where there can be no other adequate relief, that a court of equity will entertain an action to cancel the lease on such ground.

■■ As we view the case, it is not so much a question of whether or not the appellants continued to develop the land after they discovered the gas in the first well, and by such continued development complied with the implied covenant so to do, as it is a question of whether or not they have produced oil or gas in paying quantities as contemplated in the lease within the time provided by the lease itself. As has been stated, the estate held under the lease by appellants is what the law denominates a "determinable fee." It is a fee-simple title because it may continue, forever, and it is determinable because it may come to an end upon contingencies. The lease provides that it shall remain in force for a term of five years from its date, which was February 4, 1930, and as long thereafter as oil or gas, or either of them, is produced in paying quantities from the land by the lessee. If, within five years from the 4th of February, 1930, appellants have developed and produced oil or gas from said land in paying quantities, their interest in the estate continues. On the other hand, according to the terms of the lease, if oil or gas is not produced from the land within the period of five years, the lease comes to an end. It terminates, and no act on the part of the lessor is necessary in order to accomplish that result. The lease expires, and, after February 4, 1935, if no oil or gas was being produced, the lessee had no lease upon the land nor any interest whatever therein. The trial court seems to have taken this view of the controversy, and we think it is the proper one. It then becomes a question of whether or not the production of sour gas from the well in the quantity and under the conditions under which it was produced complied, within the five-year term, with the provision of the lease to the effect that the lessee would, within that term, produce such commodity in paying

quantities. If it were so produced, the lease continued in full force and effect; if it were not so produced, the lease came to an end.

The facts are that gas was discovered and more than 7,000,000 feet per day could have been extracted from the well. It is not disputed that it would produce that amount of sour gas, and, if there had been an available market, the gas could have been disposed of. There was, however, no market for sour gas in the territory. Carbon black was being manufactured from sweet gas, which abounded in almost inexhaustible quantities in the same general territory, and sweet gas was more desirable for the manufacture of carbon black, as well as other commodities, than was sour gas. It was shown that, if as much as seventy five or a hundred million feet of sour gas per day could be produced within the vicinity, it probably would have attracted the construction of carbon black and natural gasoline plants and it could have been disposed of or a market created for it; but there was no market for small quantities of sour gas such as was produced from this well. It was further shown that appellants knew this at the time the lease was executed and at the time they began and completed the drilling of the well. They also knew the locality was generally considered sour gas territory. At the rate of production and the price that could have been obtained for sour gas, we think the conclusion is warranted that to drill enough wells to produce sufficient gas to attract the construction of carbon black or natural gasoline plants in the vicinity so as to create a market for sour gas would have been out of the question. Appellants went to the expense of $25,000 in drilling the well which was drilled. It was shown that the value of its production, even after a market was available, did not exceed $8.97 per day, thus showing that the expense of drilling other wells would not only have been impracticable, but a wild and foolish venture.

In discussing the question of the production of oil in paying quantities under the provision of a lease similar to the one involved here, the Commission of Appeals, in Hanks v. Magnolia Petroleum Co., 24 S.W.(2d) 5, 6, quoted and approved a definition given in Barbour, Stedman & Co. v. Tompkins, 81 W.Va. 116, 93 S.E. 1038, L.

R.A.1918B, 365, as follows: "The question is not how much may be derived from the sale of the gas, but rather whether it may be sold in the market for consumption as fuel with reasonable expectation of profitable returns in excess of costs and expenses. Whether there is a reasonable basis for the expectation of profitable returns from the well is the test. If the quantity be sufficient to warrant the use of the gas in the market, and the income therefrom is in excess of the actual marketing cost, the production satisfies the term 'in paying quantities.'"

Similar definitions are given in cases cited from other states, and we think it is a correct one. Indiana Natural Gas & Oil Co. v. Wilhelm, 44 Ind.App. 100, 86 N.E. 86.

The lease under which appellant holds provides that it shall remain in force for a term of five years from its date, and so long thereafter as oil or gas, or either of them, is produced in paying quantities. Under the above definition of the term employed by the parties in the contract, appellants, although they discovered gas to an extent and in quantity that would have complied with their obligation in the lease if a market had been available for the kind of gas discovered, did not, under the circumstances of this case, discover nor produce gas in such quantities as, under the law, would be "paying quantities," within the five years provided by the lease. Their estate, consisting of a determinable fee, determinable upon their failure to produce oil or gas in paying quantities within such term, came to an end on February 4, 1935, as found by the trial court, after which they did not possess any interest whatever in the land. The lease did not exist. The term had closed, and the interest they procured by the lease was gone. It is not a question of forfeiture for failure to continue to develop the land, nor does it rest upon any other contingency. Appellants did not contract for a term which would depend upon the possibility of procuring a market for the product at some date subsequent to its express date of expiration. The lease did not provide that it should remain in force and effect for five years, and as long thereafter as there may be prospects of a market for the product, and it is not the duty of the courts to make contracts for parties but only to construe such contracts as they make for themselves.

750

We have carefully considered all of the propositions and assignments of error made by appellants, and, finding no error committed in the trial of the case, the judgment is affirmed.