## COX et al. v. MILLER.
### No. 2474.

Court of Civil Appeals of Texas. Eastland.
Oct. 20, 1944.

Rehearing Denied Nov. 24, 1944.

Baker & Baker, of Coleman, for appellants.

Dibrell, South & Snodgrass, of Coleman, for appellee.

GRISSOM, Justice.

On September 13, 1937, Mitchell M. Cox and others executed an oil and gas lease to R. M. Ragsdale. It recited that for a consideration of $10 paid and "the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed," the lessors had leased 179 acres for the purpose of mining and operating for oil and gas. The lease contained the following provisions material to a decision of the case (1) "It is agreed that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." (2) That lessee agreed to pay lessor ⅛ of the proceeds derived from the sale of gas; and (3) "If no well be commenced on said land on or before the 13th day of September, 1938 this lease shall terminate as to both parties, unless the lessee on or before that date shall pay * * * One Dollar per acre, which shall operate as rental and cover the privilege of deferring the commencement of a well for twelve months from said date. In like manner and upon like payments * * * commencement of a well may be further deferred for like periods of the same number of months successively."

(4) "Should the first well drilled on the above described land be a dry hole, then and in that event, if a second well is not commenced on said land within twelve months thereafter, from the expiration of the last rental period for which rental has been paid, the lease shall terminate as to both parties, unless the lessee on or before the expiration of said twelve months shall resume the payment of rentals in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payments of rentals, as before provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments."

(5) "Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing."

(6) "Lessee agrees, as part of the consideration for the execution and delivery of this lease, to commence the drilling of a well upon the above described 179 acre tract on or before the expiration of sixty (60) days from the date of the execution of this lease by all the lessors above named, and in any event not later than the 1st day of December, 1937; said well to be drilled so as to test the Ranger Lime at an approximate depth of 2500 feet, unless oil or gas should be found in paying quantities at a lesser depth. In the event lessee should fail to commence the drilling of said well within the time and in the manner hereinabove stated, this lease shall be of no further force and effect, and neither party thereto shall be under any further liability to the other."

On March 21, 1938, Ragsdale assigned the lease to Dr. J. H. Harvey. April 1, 1938, Dr. Harvey began drilling a well. On or before September 13, 1938, Dr. Harvey completed the well. Gas was discovered with a daily potential production of 1,000,000 cubic feet with 390 pounds pressure. There was no oil. Dr. Harvey decided to save the well as a paying producer of gas and informed plaintiffs of his intention and that he was going to attempt to market the gas. Whereupon, Dr. Harvey capped the well, shutting in the gas and leaving 1087 feet of 8½ inch casing and 2410 feet of 5¾ inch casing in the well. He then, according to his testimony, diligently sought a market for the gas and tried to get a pipe line built to the well; these efforts continued from September 1938 until the spring of 1943; he was never able to sell any gas. He, therefore, decided to plug the well and salvage the casing. Miller drilled the well for Dr. Harvey and owned some part of the casing in the well. As a part of the consideration for drilling the well, Miller was entitled to an additional $2500 to be

paid out of gas or oil produced and sold from the well. Miller was instructed by Dr. Harvey in April, 1943 to draw the casing and plug the well. When Miller attempted to draw the casing plaintiffs, on April 20, 1943, obtained an injunction preventing him from doing so. Dr. Harvey then sold or gave his interest in the casing to Miller.

Plaintiffs, Mitchell M. Cox and John McInnis, obtained the injunction restraining defendant from pulling the casing upon allegations to the effect that the lease had terminated long ago; that no producing oil or gas well was ever drilled by defendants; that defendants had abandoned the lease; that defendant's claim to the casing was barred by limitation and that pulling the pipe would injure plaintiff's land. Dr. Harvey filed a disclaimer and was dismissed from the suit.

Miller filed an amended answer and cross-action, wherein he alleged the execution, in September, 1937, of the lease by Cox and others to Ragsdale, alleged its terms and specifically (1) the fifth provision, giving lessee the right to remove his casing "at any time." Miller further alleged (2) that, in March 1938, lessee Ragsdale sold and assigned the lease to Dr. Harvey; that the assignment recited that plaintiffs should receive ¾₄ of the proceeds from the sale of oil and gas credited to the ⅞ working interest in said lease to the extent of $3,000, if and when produced, saved and marketed. Defendant also alleged that "said sale, assignment and transfer was made with the acquiescence and approval of the said Mitchell M. Cox and John McInnis, who owned the surface estate and part of the royalty in said land and who received an additional cash consideration from the said Dr. J. H. Harvey for reinstatement of said lease, and all the lessors in said original lease recognized the validity of said lease, notwithstanding the failure of the lessee, R. M. Ragsdale, to comply with drilling obligations thereof, up to that time, the said J. H. Harvey was induced to accept said assignment and drill a test well for oil and gas on said lease to reliance upon the validity of said oil and gas lease." Defendant further alleged (3) that on April 1, 1938, Dr. Harvey, having contracted with Miller to drill the test well, the drilling of said well was duly commenced and thereafter diligently prosecuted by defendant Miller for Dr. Harvey

and "gas was discovered at a depth of about 2510 feet, with daily potential production of 1,000,000 cubic feet and rock pressure of 390 pounds; that in drilling said well 710 feet of ten inch casing was run therein, 1890 feet of 8½" casing was run and set on top of the gas sand and cemented; that after discovery of said gas and failure to discover oil in paying quantities the said Dr. J. H. Harvey decided to save said gas well as a paying gasser and he informed the plaintiffs herein of his intention to save said gasser and to attempt to market the gas and left said well cased with 1087 feet of 8½" casing and 2410 feet of 5¾" casing and capped said well shutting in the gas pending the finding of a market therefor; that said well was completed as a gas well on or about the first day of September, 1938."

By supplemental petition plaintiffs admitted the foregoing allegations of the defendants' answer. Miller alleged the further facts (not admitted in plaintiffs' pleadings) that a gas well was discovered "in sufficient quantity and sufficient rock pressure to constitute the same a paying gas well, conditioned on available market therefor; that there was no immediate market for said gas and no gas pipeline in the vicinity to which connection could be made"; and that it was necessary to either sell the well and lease or find a market for the gas; that Dr. Harvey tried to find a purchaser for the well or a market for the gas, both before and after expiration of the five year term. Miller alleged that "because of the discovery of said gas and completion and equipping said well which was capable of producing gas in paying quantity whenever a market therefor could be obtained," Dr. Harvey had a valid lease on plaintiffs' land from September 13, 1937, to September 13, 1942, "without any obligation to drill or pay rentals"; that from the completion of the well until enjoined from pulling the casing Dr. Harvey tried to find a market for the gas "but without success." He alleged that Dr. Harvey had transferred his interest in the casing to Miller; that "there is no reasonable prospect of a market for the gas from said well notwithstanding its capacity to produce gas in paying quantities." Miller asked for dissolution of plaintiff's injunction and judgment for title to the casing and an adjudication of his right to pull the casing or for judgment against plaintiffs for converting it. He

also sought judgment for damages caused by the injunction.

The jury found:

1. That the gas well at the time of completion was a producing gas well in paying quantities.

2. That from September 13, 1939 to April 13, 1943 was, under all the facts and circumstances in evidence, a reasonable time for Miller to pull the casing.

2a. That from September 13, 1942 to April 13, 1943 was, under all the facts and circumstances in evidence, a reasonable time for Miller to pull the casing.

3. That Harvey did not abandon the casing.

4. That Miller was not damaged by the injunction.

5. That the value of the pipe in the well was $2,585.

Judgment was rendered that plaintiffs take nothing; that the injunction be dissolved; that Miller have judgment for title and possession of the pipe and authorizing Miller to remove it from plaintiffs' land within 90 days after final judgment, and that plaintiffs be enjoined from interfering with defendant in so doing. The judgment further recited that plaintiffs could keep the pipe by paying $2,585 to defendant.

Plaintiffs have appealed.

■ Plaintiff McInnis testified concerning the consideration paid by Dr. Harvey to plaintiffs in his purchase of the lease from Ragsdale substantially as alleged by defendant. The evidence showed that plaintiffs actually received a cash consideration from Dr. Harvey in connection with the assignment of the lease to Harvey, and in substance that they agreed with Harvey, at the time he purchased the lease from Ragsdale and paid a cash consideration to plaintiffs and promised them an additional consideration to be paid out of the oil and gas to be produced and marketed from the lease, that paragraph 6 of the lease, requiring commencement of a well by December 1, 1937, had been complied with. Plaintiff McInnis testified that "Shortly after he (Ragsdale) took the lease, Tip Winters drilled a hole twenty-five or thirty feet and stopped; and I think that was done in the interest of Mr. Ragsdale to hold the lease for him." Under the circumstances plaintiffs are estopped to contend that the lease had terminated before Harvey bought it, because Ragsdale had not commenced a well by December 1, 1937. Mitchell v. Simms, Tex.Com.App., 63 S.W.2d 371; McCoy v. Texon Royalty Co., Tex.Civ.App., 124 S.W.2d 877, 881; Myers v. Crenshaw, Tex.Civ.App., 116 S.W.2d 1125, 1132. Therefore, we shall hereafter disregard said sixth provision of the lease, requiring commencement of a well by December 1, 1937.

It is defendant's contention that a well producing gas in paying quantities was completed by Dr. Harvey on or before September 13, 1938, and, therefore, the lessee was not thereafter required to either drill another well or pay delay rentals to preserve the life of the lease for the full primary term of five years, ending September 13, 1942. It is defendant's alternative position that if the well was equivalent to a dry hole, because of Harvey's inability to market the gas, the lease remained in effect until September 13, 1939. Defendant concludes that his attempt to remove the casing was made within a reasonable time after termination of the lease, regardless of whether the date of its termination was September 13, 1939, or September 13, 1942.

As we understand plaintiffs' chief contentions, they are, first, that the lease terminated on December 1, 1937, because the evidence shows conclusively that no well was commenced until April 1938. In making such contention plaintiffs are relying upon the sixth provision of the lease, which required commencement of a well by December 1, 1937. Said contention is overruled for the reasons heretofore stated. Plaintiffs further contend that the well drilled by Dr. Harvey in 1938 did not produce in paying quantities and therefore the lease terminated one year after completion of the well, or September 13, 1939.

The lease provided that if a well was not commenced on or before September 13, 1938, the lease would terminate unless a rental of $1 per acre was paid. A well was not only commenced, but was completed by September 13, 1938. But, the lease further provided that if the first well drilled was a "dry hole," then, if a second well was not commenced within 12 months thereafter the lease would terminate, unless on or before the expiration of said period lessee paid $1 per acre rental. Such requirement was applicable to each subsequent 12 month period during the 5 year primary term. After comple-

tion of the gas well by Harvey in September 1938, no other well was commenced and no rentals were paid.

The lease is what is commonly called an "unless" lease. 31 Tex.Jur. 743. Said provision is not one for forfeiture based upon a condition subsequent but is a limitation upon the lessee's estate, marking the limit of the estate granted. The effect of failure to either pay rent or drill within the time stipulated, when required, is to automatically terminate the lease. Humble Oil & Refining Co. v. Davis, Tex.Com.App., 296 S.W. 285, 287; Guerra v. Chancellor, Tex.Civ.App., 103 S.W.2d 775, 777, writ refused; Mitchell v. Simms, Tex.Com.App., 63 S.W.2d 371; Empire Gas & Fuel Co. v. Saunders, 5 Cir., 22 F.2d 733; Davis v. Bussey, Tex.Civ. App., 298 S.W. 656, 657, writ refused; Hammonds v. Flewellen, Tex.Civ.App., 48 S.W.2d 813; Temple Lumber Co. v. Arnold, Tex.Civ.App., 14 S.W.2d 926, 929; 31 Tex.Jur. 842.

The provision that the lease should remain in force for five years and as long thereafter as oil or gas is "produced" from said land means produced in paying quantities. Garcia v. King, 139 Tex. 578, 164 S.W.2d 509. The stipulation that lessee should have a right to remove the casing "at any time," means nothing more than that the lessee has a reasonable time after termination of the lease to remove the casing. 39 A.L.R. 1258; Terry v. Crosswy, Tex.Civ.App., 264 S.W. 718, 720; Armstrong v. Federal Supply Co., Tex.Civ.App., 17 S.W.2d 170.

In order for the lessee or his assignee, or one standing in their place as Miller does, to show that gas was "produced" it is necessary to show that gas was discovered within the time prescribed in sufficient quantities to warrant its use in some market, and that the probable income therefrom is in excess of the cost of producing and marketing the gas, but not including the cost of drilling the well. It must also be shown that there was a reasonable expectation and probability of a market for the gas at the time the well was completed. Hanks v. Magnolia Petroleum Co., Tex.Com.App., 24 S.W.2d 5. Under the decision in Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App., 107 S.W.2d 746, 749, it must be held that the fact that the well was capable of producing did not make it a well producing gas in paying

quantities within the meaning of provision 1, that the lease would be in force for 5 years and as long thereafter as gas or oil is "produced." See also Kies v. Williams, 190 Ky. 596, 228 S.W. 40; Butler v. Jenkins Oil Corp., Tex.Civ.App., 68 S.W.2d 248, 251, affirmed 128 Tex. 356, 97 S.W.2d 466.

In Stanolind Oil & Gas Co. v. Barnhill, Tex.Civ.App., 107 S.W.2d 746, 749, writ refused, it was held that gas was not "produced" in paying quantities and the lease terminated at the expiration of the primary term. The facts were that a 5 year lease was executed February 4, 1930; on March 31, 1931, the lessee completed the drilling of a gas well. It had a potential production of 7,000,000 cubic feet of sour gas per day and a pressure of 410 pounds. The lessees made every reasonable effort to market the gas but were unable to do so until October 1935, when a market for said gas developed. Appellants contended that the lease did not terminate by failure to sell the gas on account of a non-existing market. The reason for the holding was simply that there was no market for the gas. The court said: "Appellants did not contract for a term which would depend upon the possibility of procuring a market for the product at some date subsequent to its express date of expiration. The lease did not provide that it should remain in force and effect for five years, and as long thereafter as there may be prospects of a market for the product, and it is not the duty of the courts to make contracts for parties but only to construe such contracts as they make for themselves." Where the real consideration for a lease is a part of the oil or gas produced, or its proceeds, the lessee's obligation to "produce" oil or gas in order to prevent termination of an "unless" lease is not discharged merely by drilling or by discovering oil or gas with potential production in paying quantities, but the lessee is further required to operate the well and market the product within a reasonable time. In Smith v. Sun Oil Co., 172 La. 655, 135 So. 15, the Supreme Court of Louisiana held that although gas wells on a lease were capable of producing from a one-half million to a million feet of gas per day, it was not producing in paying quantities when there was no market for the gas and, therefore, the lease terminated, notwithstanding such potential production. See Collins v. Mt.

328

Pleasant Oil & Gas Co., 85 Kan. 483, 118 P. 54, 38 L.R.A.,N.S., 134, and South Penn Oil Co. v. Snodgrass, 71 W.Va. 438, 76 S. E. 961, 43 L.R.A.,N.S., 848, 852. The rule is otherwise where the lease provides in the alternative for a stipulated rental for each gas well and the rental is paid. Summers Oil & Gas (Perm.Ed.) Vol. 2, p. 141, sec. 299; p. 349, sec. 400; p. 157, sec. 300. See also Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 137 A.L.R. 1032, and 8 Tex.Law Review 519.

Special Issue No. 1 inquired whether the gas well completed by Dr. Harvey in September 1938 was at the time it was completed a producing gas well in paying quantities. The jury answered said issue "Yes". In connection with that issue the court instructed the jury that "the words 'in paying quantities,' as applied to a gas well mean that the gas discovered must be sufficient at the time of the completion of the well to pay the lessee a profit, though small, over operating and marketing expenses, although it may never repay the cost of drilling the well." In connection with this issue plaintiffs requested the court to give the following instruction: "You are instructed that by the term 'dry hole' as used in the lease contract is meant any well that does not come within the definition of a producing gas well in paying quantities as defined by the court's charge given you herein." This instruction was refused. Plaintiffs assert that the court erred in refusing to give said instruction. The term "dry hole" was not used in the charge and hence did not need to be defined. Plaintiffs do not in any other way present a point that would call for a specific decision as to whether or not the gas well was a "dry hole" within the meaning of that term as used in the lease. We agree with plaintiffs that issue 1, that is, whether at the time of its completion the well produced gas in paying quantities, was not a question of fact. Assuming that the well was capable of producing gas in paying quantities if connected with a pipeline, it does not follow that gas was "produced" within the meaning of that word as used in provision one of the lease. It is undisputed that no pipeline was available; that there was then no market for the gas, and, although Harvey and defendant made diligent effort to find or create a market from the completion of the well until the institution of this suit, no market was found and no gas sold. The record conclusively shows that gas was not "produced" within the meaning of provision one of the lease, that the lease should remain in effect for 5 years "and as long thereafter as oil or gas * * * is produced from said land." Stanolind Oil & Gas Co. v. Barnhill, Tex. Civ.App., 107 S.W.2d 746, 749, writ refused; Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783, 784, 137 A.L.R. 1032; Freeman v. Magnolia Petroleum Co., 141 Tex. 274, 171 S.W.2d 339; Garcia v. King, 139 Tex. 578, 164 S.W.2d 509.

We question the correctness of the idea that the well in question, with capacity to produce 1,000,000 cubic feet of gas per day, should be considered a "dry hole", as a matter of law, within the meaning of the term as used in the lease, solely because there was no market for the gas. True, the real purpose of the parties in the execution of the lease was to obtain production from which a profit might be derived. If there is no market, there can be no profit. But, if the parties meant that an oil or gas well that had a potential capacity to produce in tremendous quantities should be considered a "dry hole",— simply because there was no market—they could easily have so stipulated in the lease. The terms "dry hole" and a well "producing gas in paying quantities" are not necessarily the converse of the other. "Dry hole" is not defined in the lease. If it has a technical meaning it is not shown. See Chapman v. Ellis, Tex.Civ.App., 254 S.W. 615, 617; Hall v. McCleskey, Tex.Civ.App., 228 S.W. 1004, 1006; Frost v. Martin, Tex. Civ.App., 203 S.W. 72; Murphy v. Garfield Oil Co., 98 Okl. 273, 225 P. 676; Summers Oil & Gas, Vol. 2, p. 264, sec. 351; Parish Fork Oil Co. v. Bridgewater Gas Co., 51 W.Va. 583, 42 S.E. 655, 59 L.R.A. 566, 569. If the well is not a dry hole then provision 3 is not controlling. However, we are not required to definitely decide whether or not, under the circumstances of this case, a well capable of producing 1,000,000 cubic feet of gas per day, when there is no market for the gas, constitutes, as a matter of law, a "dry hole", within the meaning of that term as used in the lease. See McGraw Oil & Gas Co. v. Kennedy, 65 W.Va. 595, 64 S.E. 1027, 1029, 28 L.R.A.,N.S., 959; Summerville v. Apollo Gas Co., 207 Pa. 334, 56 A. 876; Cole Petroleum Co. v. U. S. Gas & Oil Co., 121 Tex. 59, 63, 41 S.W.2d 414, 86 A.L.R. 719; Elliott v. Crystal Springs

Oil Co., 106 Kan. 248, 187 P. 692, 694; Buffalo Valley Oil & Gas Co. v. Jones, 75 Kan. 18, 88 P. 537.

The question as to when the lease terminated is a preliminary one. Its determination is important only on the question of whether Miller attempted to remove his casing within a reasonable time. At the end of the five year primary term, September 13, 1942, neither oil nor gas was being "produced" from said land, as required by provision one of the lease. therefore, the lease was not in force after expiration of the five year primary term. Stanolind Oil & Gas Co. v. Barnhill, Tex. Civ.App., 107 S.W.2d 746, writ refused. If September 13, 1942, was the date the lease terminated, Miller's effort to pull the casing in April, 1943 was certainly made within a reasonable time, and the jury has so found. The jury has further found that if the lease terminated September 13, 1939 (one year after completion of the well), that plaintiffs' effort to remove the casing was made within a reasonable time from said date. Under all the facts and circumstances in evidence and giving full credence to Miller's and Harvey's testimony as to their continuous efforts to market the gas with the apparent knowledge and acquiescence of plaintiffs, as we are required to do under the jury's finding that defendant attempted to remove the casing within a reasonable time, we have concluded that we are not authorized to hold as a matter of law that Miller's delay from September, 1939 to April, 1943 was unreasonable. Therefore, if we assume that the well completed September 13, 1938, was a dry hole and that the lease terminated September 13, 1939, because Harvey failed to then commence another well or pay rental, nevertheless, under the findings of the jury, Miller's effort to withdraw the casing was made within a reasonable time, and such finding supports the judgment. (On the question of what constitutes a reasonable time within which the lessee may remove pipe from the well, see Meers v. Frick-Reid Supply Corp., Tex.Civ.App., 127 S.W.2d 493; Armstrong v. Federal Supply Co., Tex.Civ.App., 17 S.W.2d 170, 172; 39 A.L.R. 1259; A. & M. Petroleum Co. v. Friar, Tex.Civ.App., 152 S.W.2d 470, 471; 36 Words & Phrases, Perm.Ed., p. 375 et seq.; In re Sternberg, D.C., 300 F. 881, 884; Dunning v. Badger, Tex.Civ. App., 74 S.W.2d 151, 155; Alsam Holding Co. v. Consolidated. etc., 167 Misc. 732,

4 N.Y.S.2d 498, 505; Houston & T. C. R. Co. v. Roberts, 50 Tex.Civ.App. 69, 109 S. W. 982, 983; English v. Underwood, Tex. Civ.App., 5 S.W.2d 1033, 1036; Szanto v. Pagel, Tex.Civ.App., 47 S.W.2d 632, 635; Smart v. Panther, 42 Tex.Civ.App. 262, 95 S.W. 679, 681. We are of the opinion that what constituted a reasonable time was a question of fact, and that it was fairly presented to the jury under the instructions given by the trial judge. In Hart v. Bullion, 48 Tex. 278, 289, the Supreme Court said: "What is a reasonable time depends undoubtedly upon the nature and character of the thing to be done, the circumstances of the particular case, and the difficulties surrounding and attending its accomplishment. As an abstract question, what is a reasonable time for performance may be one of law; but unless the facts upon which its determination depends are admitted, its determination involves a mixed question of law and fact, and must be determined by the jury, under the instructions of the court, where the pleadings and evidence are sufficient to present an issue of fact in regard to it." Fisher v. L. E. Whitham & Co., 120 Tex. 516, 530, 39 S.W.2d 869, 79 A.L.R. 1095, and J. W. Crowdus Drug Co. v. Nichols, Tex.Civ. App., 194 S.W. 484, 486 are to the same effect.

We think that the errors mentioned were not calculated to injure plaintiffs and that reversible error is not shown. The judgment is affirmed.

FUNDERBURK, Justice (concurring).

I agree that the judgment should be affirmed. I am unable to see that it is material to the question for decision whether the lease was a "drill or forfeit" lease, a "drill or pay" lease, or an "unless" lease, or when, whatever its classification, it terminated.

Lessors did not own the casing, and the lease gave them no contract right to acquire it. On the contrary, Lessors expressly recognized in the contract that "Lessee shall have the right at *any time* to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing." (Italics mine.) The contract neither expressly nor impliedly imposed any duty upon Lessee to remove his casing. So far as affected by the contract, he could remove it or not. He could abandon it, if he so desired. There was, therefore, no basis for an implication of a time

element qualifying his optional right to remove it.

Had the contract while declaring Lessee's right to remove the casing have specified a limit of time in which he should exercise such right, the natural purport of such provision would have been to imply a duty to exercise the right, and, of course, to exercise it within the time specified. If a reasonable time was specified the duty would be implied to exercise the right in a reasonable time. If no time was specified, but the contract, or the law, imposed a duty to remove the casing at all, then the law would, perhaps, imply a reasonable time.

There are two or more good reasons why in my opinion that principle is not applicable here. In the first place, neither the lease contract nor the law expressed nor implied any duty to remove the casing. But, even if that proposition be not warranted, the contract did not leave the time element to implication. It says "at any time", which expresses an unlimited time thereby excluding any implication of a limited time.

Of course one provision of a contract may, considered alone, express an intention that a right given or recognized may be exercised "at any time"; and yet another provision, or other provisions, may, standing alone, express an intention with which it would be inconsistent that such right be exercised unlimited as to time. In such a case the expressions of apparently different intentions must, if possible, be reconciled. In other words, there would be a contract which, being ambiguous, calls for construction. If need be, general language, such as the phrase "at any time" may be limited or qualified, if necessary, to effect a more general intention expressed, or perhaps necessarily implicit, in some clear certain purpose of the contract.

In my opinion this is no such case. What purpose expressed or necessarily implicit in the lease is inconsistent with the right of the Lessee to draw and remove the casing *at any time?* This was not something to be done as incidental to the rights of the Lessors or Lessee under the lease and which would be defeated or in some way adversely affected by failure to do it in a reasonable time. The provision in question was not the source of Lessee's title to the property, not a qualification upon his right or title to it. It certainly was not the source of Lessee's right

to draw and remove the casing while the lease was in force. Lessee had that right by virtue of the easements granted by the lease, which, of course, continued to the termination of the lease. The only practical effect of the provision, insofar as it could relate to any right of the Lessors, was to license the Lessee to go upon the land after termination of the lease for the limited purpose of taking away his personal property without being a trespasser. In practical effect it amounted to no more than written consent given in advance to the Lessee to enter upon Lessors' land and take away Lessee's own personal property in which Lessors had no interest and which consent was necessary only because taking away such property even by its owner involved going upon the Lessors' land after the former easements therein had terminated. This was a consent which Lessors could have given orally at any time. Why, then, could they not give it in writing in advance? Let us assume that the actual intention of the parties to the lease was to give or acknowledge the right of Lessee to draw and remove the casing *at any time,* or, in other words, for an unlimited time. Unquestionably they had the power and right to make such an agreement. How then could they have expressed such an intention any better than they have done in this lease by the provision in question?

My tenant moves, leaving a stove in the back yard, intending to abandon it. The bare fact that it is on my land does not work a transfer of title from him to me. If my neighbor across the street, recognizing the abandonment, takes possession of the stove and moves it to his house, he becomes the owner of the stove. Pearson v. Black, Tex.Civ.App., 120 S.W. 2d 1075. He may have committed a technical trespass by going on my land without my consent. But my consent was not necessary to his acquisition of title to the stove. Since the stove was not mine and not a part of my land, if I sue my neighbor for trespass, the value of the stove cannot, of course, be included in the damages recoverable for the trespass. If my tenant, upon quitting the leased premises, leaves the stove but without intention of abandonment, no relinquishment or transfer of title results. Without my consent, expressed or implied, he could, perhaps, not come upon my land, even for the purpose of taking away his own property with-

out being guilty of a trespass. But ten years later, no adverse possession having intervened, with my consent then given or theretofore given and remaining unrevoked, he could go upon my land and take away his stove without being guilty of a trespass. If in the rental contract I had given my consent in advance and had not seen fit to limit it in time, the consent would continue indefinitely unless revoked. Granting that I could revoke the license, I could not wait until he came for his property and then revoke it so as to deprive him of it. If the presence of the property on my premises became objectionable, I could revoke the license,—if it was nothing more than a license,—after reasonable notice and not with such effect as virtually to deprive him of his property against his will. Adams v. Weir & Flagg, Tex.Civ. App., 99 S.W. 726.

In saying, as I have, in effect that the provision in question amounts to no more than a license, I do not mean to be understood as expressing the opinion that such was the only purpose of such provision. In fact it may not have been a conscious purpose at all, but if not, it was in effect necessarily included in a larger purpose. The larger purpose was no doubt to settle in advance that the "machinery and fixtures," including the "casing" in the well, was intended not to become in any event real fixtures. The provision was one common in such leases, since a time when no one dreamed that a lease was in effect a deed conveying oil or gas as corporeal real property and vesting the grantee with a determinable fee estate in such substances as distinct from the land wherein they might lie. When such a provision first appeared in leases, the leases were regarded as evidencing, if not mere licenses, at most such incorporeal rights in the land of another as that in a very true and proper sense casing in a well could be a real fixture annexed to the land, since the land including the oil and gas therein, if any, while remaining in place belonged to the Lessors. The purpose of such a provision, when first so used, was like that mentioned in Wright v. Macdonnell, 88 Tex. 140, 30 S.W. 907, 909, as to which it was said: "It was evidently contemplated that the law of fixtures should not apply. * * * The object of the parties was not to leave their rights to be determined by the law of fixtures, but to fix them by express agreement." "The

intention of the party making an annexation [of personal property to land, so as to become real fixtures and therefore a part of the land] is," according to Lewis' Lectures on Real Estate, p. 8, "the controlling element in determining whether the thing annexed is a part of the realty or continues personalty." Then, how can any question as to such controlling intention be more completely and certainly forestalled than by the provision under consideration, wherein Lessors recognized in unqualified terms the right of Lessee to draw and remove the casing at any time?

I have not taken the time to investigate fully into the origin and full history of the notion expressed in the oft·repeated dictum to the effect that when one has a recognized right to remove his personal property from the land of another whereon it is lawfully situated, such right is qualified to the extent that he must exercise it within a reasonable time upon penalty of losing his property. I think it may safely be assumed that it had its origin in the law of real fixtures as affected by the principle of abandonment. In Wright v. Macdonnell, supra it was said: *"In the absence of a special stipulation to the contrary,* fixtures placed upon the demised premises by the tenant are personal property, *subject, however, to become parts of the realty,* if not removed by him during the time allowed him by law for their removal."* (Italics mine.) It is a pretty safe guess, I think, that upon no better foundation than this rests the vastly expanded idea that regardless of the intention plainly expressed by the words of a contract, the law will override such expressed intention and substitute for the unlimited import of the words "at any time" the limited import of the words "within a reasonable time." This idea— mere dictum in all the cases I have seen— has no support in the above quotation from Wright v. Macdonnell, supra. The rule there declared related to the relation of landlord and tenant, and even so, was declared to exist "In the absence of a special stipulation to the contrary." We have such stipulation to the contrary in this case.

But further, under the modern view in this state of the nature of such a lease, the casing in the well was never, even in the absence of any stipulation, annexed to the land of the Lessors so as to become a real fixture. One of the tests where

the question is not settled in advance by contract is "adaptation of the fixture for use with the realty." Lewis' Lectures on Real Estate, p. 8. Considering the land as realty, distinct from the oil and gas in the land, the casing in a well has no adaptation for use with the realty. The only realty to which the casing might seem to be annexed was the oil or gas in place under the ground. It would not attach to the oil or gas or to the leasehold interest as a real fixture in this case, since, if the lease terminated as long ago as one year after completion of the well, it was only because the well was a dry hole. In other words, there was no realty consisting of oil or gas in place to which the casing could be annexed. Besides, it has been held that the casing in a well does not pass by the conveyance of a leasehold estate. Moore v. Carey Bros. Oil Co., Tex. Com.App., 269 S.W. 75, 39 A.L.R. 1247. If it were a real fixture, it would, of course, pass.

While from my view point I do not regard the nature of the lease or the time of its termination material to the question to be determined, I do not wish to be understood as assenting to some of the views expressed in the majority opinion.

In my opinion the lease, properly construed, is not an "unless" lease, but a "drill or forfeit" lease. Summers Oil and Gas, Sec. 438. Evidently an "unless" lease *form* was used, but there is a conflicting specific provision obligating the lessee absolutely to commence a well not later than December 1, 1937, or else the lease would terminate. That such provision is in necessary conflict with the "unless" provision is very evident. Under the "unless" provision Lessee had the right not to commence a well before September 13, 1938, and not even then if on or before said date he paid a stipulated rental. Under the special provision Lessee could not delay the commencement of a well longer than December 1, 1937, without the lease being subject to a forfeiture and without any option to avoid such forfeiture by payment of rentals. I think the provisions of an "unless" lease are so generally known and the use of printed forms in executing such leases is a practice so general, that we can say from our judicial knowledge of such facts that the special provision was written into an "unless" form of lease. If so, this enables us to give effect to such part of the lease by rejecting the printed part in conflict with

the written part upon the principle that in such a case written provisions control over printed provisions. Even in that case, however, there may be some question whether the conflict extends to include the provision reading as follows: "Should the first well drilled * * * be a dry hole, then and in that event if a second well is not commenced on said land within 12 months thereafter from the expiration of the last rental period for which rental has been paid, the lease shall terminate as to both parties, unless the lessee on or before the expiration of said 12 months shall resume the payment of rentals in the same amount and in the same manner as hereinbefore provided. And it is agreed that upon the resumption of payment of rentals as before provided, that the last preceding paragraph hereof governing the payment of rentals and the effect thereof shall continue in force just as though there had been no interruption in the rental payments." I shall not take space to detail the reasons which seem to me to compel the conclusion that this provision must also be rejected as involved in the before mentioned conflict, because it is immaterial whether it is or not. If it is not included and therefore rejected, the result is to show that the lease is a "drill or pay" lease, which, the same as a "drill or forfeit" lease, is, so far as I know, under all authority regarded as terminable by a forfeiture provision as distinct from a limitation. Summers Oil & Gas, sec. 334. The well that was drilled was delayed in commencement, but there was no forfeiture because of a waiver thereof, as we all agree. Even if the well was a dry hole the forfeiture for failure to commence another well or pay rental was just as clearly waived by the Lessors' acquiescence in the efforts of Lessee to make the well a gas producer. There was no forfeiture, in any event, in the absence of a declaration of forfeiture or legal equivalent thereof. No forfeiture having been declared, the lease under the uncontroverted evidence terminated by reason of the limitation of the term at the end of five years from the date of the lease.

If I am in error in the view that the Lessee's right to draw and remove the casing was not limited as to the time in which to exercise such right, then nevertheless the lease terminated so recently before Lessee sought to draw and remove the casing that, as a matter of law, there was no unreasonable lapse of time.